UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS ALBERT GRALEY, | ) | CASE NO. 1:14CV728 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |
| | ) | |

Thomas A. Graley ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the Commissioner's decision and dismiss Plaintiff's complaint in its entirety with prejudice:

## I.   PROCEDURAL HISTORY

In March of 2012, Plaintiff filed applications for DIB and SSI alleging that he became disabled due to Post-Traumatic Stress Disorder ("PTSD"), extreme low back and shoulder pain, and anxiety. ECF Dkt. #11 ("Tr."[2]) at 215-229. The SSA denied Plaintiff's claims initially and on reconsideration. *Id*. at 81-106. Plaintiff filed a request for hearing before an administrative law judge ("ALJ") and on January 31, 2013, an ALJ conducted a hearing where she received testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 31-70, 160.

On February 21, 2013, the ALJ issued a decision finding that Plaintiff was not disabled since

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

October 15, 2011, his alleged onset date.  Tr. at 15-26.  Plaintiff requested review of the ALJ's decision by the Appeals Council, but the Appeals Council denied his request for review.  *Id*. at 1-8. On April 2, 2014, Plaintiff filed the instant suit.  ECF Dkt. #1.  This case was automatically referred to the undersigned on April 2, 2014 for the issuance of a Report and Recommendation.  On July 21, 2014, Plaintiff filed a brief on the merits.  ECF Dkt. #13.  On September 19, 2014, Defendant filed a brief on the merits.  ECF Dkt. #15.  On October 3, 2014, Plaintiff filed a reply.  ECF Dkt. #16.

## II.   SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

On February 21, 2013, the ALJ determined that Plaintiff suffered from degenerative disc disease ("DDD") of the cervical spine, obstructive sleep apnea, headaches/migraines, diverticulitis, hypertension, left shoulder degenerative joint disease ("DJD"), anxiety disorder not otherwise specified ("NOS") vs. PTSD, major depressive disorder, and cannabis abuse, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c).  Tr. at 18.  The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").

The ALJ further determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: only occasional reaching overhead with the non-dominant left upper extremity; the ability to understand, remember and carry out only simple tasks and to make only simple work-related decisions; working best with objects or data; working independently and not part of a team; no work with the public; and no more than occasional, superficial interaction with co-workers and supervisors.  Tr. at 20.  Based upon testimony of the VE, the ALJ ultimately determined that Plaintiff was able to perform jobs existing in significant numbers in the national economy and was therefore not disabled.  *Id*. at 25-26.

## III.   RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.   MEDICAL EVIDENCE

On September 22, 2011, Plaintiff presented to the Veteran's Administration ("VA") Medical Center in Idaho reporting heightened stress after he was fired from his job.  Tr. at 498.  According to Plaintiff, an employee under him complained about things that were happening while Plaintiff was

the manager and Plaintiff was shocked that he was fired. *Id*. He indicated that he was in the process of buying a home when he was fired. *Id*. Plaintiff also reported that he was smoking marijuana regularly which mellowed him out and caused no trouble for him. *Id*. He stated that he had stopped smoking so that he could have a clean system when he next applied for work. *Id*. at 499.

Mental status examination showed that Plaintiff was hyper, with very rapid and pressured speech and a highly anxious mood. Tr. at 499. Plaintiff had no suicidal ideations and his level of risk of harm to himself or others was low. *Id*. He reported that he was raised in foster homes and had a very unstable childhood and past problems with anger control. *Id*. He indicated that he self-medicated with marijuana. *Id*. He explained that he had patterns of being hyper with mood instability and obsessive-compulsive symptoms. *Id*. He had taken Sertraline and Trazodone before but was not sure how much they were helping him. *Id*. Plaintiff was assessed as having adjustment disorder with anxious mood, possible obsessive-compulsive disorder, attention deficit/hyperactivity disorder, and/or bipolar disorder. *Id*. He was started back on Sertraline and Trazodone and Clonazepam was added. *Id*. at 500. His global assessment of functioning score was 58, indicative of moderate symptoms. *Id*.

Plaintiff presented for therapy at the VA on October 6, 2011 and reported that he was doing much better. Tr. at 495. He indicated that he began a new job and his anxiety level was much reduced. *Id*. He stated that he was able to stabilize his situation and he was feeling good about his situation at home and about his finances. *Id*. He also indicated that he stopped using marijuana. *Id*.

In November of 2011, Plaintiff underwent a sleep study and received a CPAP machine for his obstructive sleep apnea. Tr. at 478, 489.

On December 14, 2011, Plaintiff presented for therapy and indicated that he had again been fired, but he took the firing as a sign that he should begin his own business ventures. Tr. at 489. He talked about starting a non-profit business, a carpentry business, or his wife starting a business making products for dogs and cats. *Id*. He also talked about returning to West Virginia to reconnect with his family to start a business with his brother or becoming a stand-up comedian. *Id*. When the therapist asked Plaintiff whether she should conclude that Plaintiff was in a manic state, he

-3-

explained that he was taken over by a loving spirit and his goal was to act in a way that reflected and promoted love. *Id.* The mental health clinician evaluated Plaintiff and found that Plaintiff's anxiety was much reduced from the last visit and while he presented in a manner very different from the last session, the mood did not appear manic, although mania was certainly what would come to mind. *Id.* at 489-490. The clinician indicated that follow-up appointments would "have to evaluate whether this is high, effective creativity vs manic euphoria that will lead to serious problems." *Id.* at 490.

On February 3, 2012, Plaintiff called the social worker at the Idaho VA and informed her that he was at his mother's house in Phoenix, Arizona as he left his wife due to physical abuse and her drug addiction. Tr. at 561. He did not endorse thoughts of harming himself and he wanted contact information for the Phoenix VA in order to obtain help. *Id.*

On March 7, 2012, Plaintiff presented to the Phoenix VA to meet with Dr. Weyer, Ph.D, for individual psychotherapy. Tr. at 437. He reported high stress levels due to being charged with trespassing while he was out of the state and he had difficulties concentrating and focusing on classes he signed up for at the college. *Id.* He had financial stressors as he had tenants at a rental property that were sending payments to his wife but she was not paying the mortgage with the money as she was supposed to do. *Id.* He also reported feeling uncomfortable living with his mother as she did not raise him and they had no emotional connection. *Id.*

Although he had no suicidal ideations, Dr. Weyer noted that Plaintiff was anxious, stressed, feeling hopeless, worthless, irritable and overwhelmed. Tr. at 438. She assessed anxiety NOS with a rule out of PTSD and mood disorder NOS with a rule out of affective bipolar disorder NOS. *Id.* He was assessed as a low suicide risk. *Id.* at 440. Plaintiff asked to get back on his medications and indicated that he had met with Physician Assistant ("PA") Markson at the VA in the past for medication management. *Id.* He was scheduled to meet with PA Markson and to meet with a social worker at the VA to obtain resources for his legal issues, financial stressors and housing issues. *Id.*

On March 13, 2012, Plaintiff presented to the Phoenix VA to meet with a social worker to assess his health care needs. Tr. at 424. It was noted that he was unemployed and had work-related difficulties as he could not deal with people. *Id.* at 429. He reported that he was using marijuana.

-4-

*Id.* at 426. He indicated that he had increased irritability and physical and verbal aggression and he was concerned that he could get to the point of hurting someone. *Id*. at 427. He had fear and anxiety in crowds and while driving and had panic attacks. *Id*. at 427-428. He reported that he was in group homes, foster care and institutions and moved around from the ages of 2-17 years old. *Id.* at 428.

Plaintiff also met with Physician Assistant ("PA") Markson for a psychiatric history and assessment. Tr. at 430. Plaintiff stated that his life was unmanageable as he had too much going on and he had lost all of his coping skills. *Id.* It was noted that Plaintiff returned for follow up at the VA after a long hiatus as he was last seen in 2009 for anxiety and stress issues. *Id.* Plaintiff indicated that the present stressful situations including a deteriorating marriage as he had been separated from his wife for the past three months, he was unemployed, he had returned to this area, and he was staying with his mother which was difficult. *Id*. He had filed for divorce and was in the process of filing for bankruptcy and his house was close to foreclosure. *Id*. He complained of crying spells, anxiety, problems making decisions, difficulty focusing and with organization. *Id*. He had enrolled at Ottawa University to take some classes with his GI benefits, but he was struggling in his studies. *Id*. His primary trauma issues related to childhood problems as he was placed in foster care due to his mother's mental health issues. *Id*. at 431.

Plaintiff denied suicidal ideations, but reported increased hopelessness, and he had depression, anxiety and PTSD from childhood issues. Tr. at 431. He had a history of resisting arrest and domestic violence issues with his wife. *Id*. He reported his current physical issues as headache, rash, wrist pain, elevated blood pressure/hypertension, neuropathy, photophobia, tinnitus, lumbago, astigmatism, refractive errors, neck and shoulder pain, and acute bronchitis. *Id*. at 432.

Upon examination, PA Markson found that Plaintiff was oriented, very stressed, tearful, with fairly good eye contact, somewhat rapid speech but not pressured, very anxious, dysphoric, depressed, denying suicidal ideations, but thoughts of dying and feelings of hopelessness, intense and distressed affect, relevant thoughts, no delusions or hallucinations, adequate judgment and fair insight. Tr. at 433. Provisional diagnoses included anxiety NOS with a rule out of GAD and PTSD, and major depression and he assigned Plaintiff a GAF of 40-43, indicating serious symptoms. *Id.*

at 434.  Sertraline, a previous medication for mood/anxiety symptoms was again prescribed, the Trazodone was renewed and a follow-up with Dr. Weyer for counseling.  *Id*.  Housing was discussed and whether Plaintiff was eligible for housing and vocational rehabilitation was also recommended.  *Id.* Plaintiff's suicide risk was low but it was agreed that his situation was "quite fragile."  *Id*.

On March 21, 2012, Plaintiff presented to the Phoenix VA for individual therapy with Dr. Weyer and he indicated that he felt stressed and anxious, felt lost about his future and overwhelmed by current stressors in his life.  Tr. at 423.  He stated that he would like to work with his hands doing carpentry, but he felt that people would look down on him for being a laborer.  *Id*.  Dr. Weyer indicated that Plaintiff's mood was stressed, his affect was tearful and anxious but his thoughts were coherent and relevant.  *Id.* She noted that Plaintiff denied suicidal thoughts and his suicide risk assessment was low.  *Id*.  She assessed anxiety disorder NOS, mood disorder NOS and rule out bipolar affective disorder.  *Id*.

On March 29, 2012, Plaintiff presented for his therapy session at the Phoenix VA and immediately indicated that he needed to be committed as he was feeling increasingly depressed and hopeless and he did not want to wake up anymore.  Tr. at 422.  He stated that he feared returning home because he feared what would happen, eluding that he would harm himself.  *Id*.  Plaintiff was referred for an assessment by Dr. Costa, the Staff Psychiatrist at Phoenix VA.  *Id*. at 386.  He indicated to Dr. Costa that he was going through a lot of things and was feeling hopeless, sad, mad, anxious and paranoid.  *Id.* at 386-387.  He related that he had lost his will to live and was having suicidal thoughts over the last few days, but no plans.  *Id*. at 387.  He reported that he had stopped eating, had no energy, was irritable and had a lack of interest and motivation.  *Id.*  He identified stressors in his life as a pending divorce, legal problems of trespassing in Utah, financial problems of bankruptcy and foreclosure, and the health of his mother.  *Id*.  He reported that he had been hospitalized in the past at four institutions and was in three foster homes as a child, with hyperactivity, attention deficit and periods of depression.  *Id*. He indicated that he was raised in foster care and his childhood was bad due to physical and mental abuse from his mother.  *Id*. at 323.  He noted that he served in the Air Force for seven years and was receiving a disability service benefit of forty percent.  *Id*.  He reported that he had tried to commit suicide at the age of 12 by

jumping out of a window.  *Id*.  He noted that he smoked ½ pack of cigarettes per day, rarely drank alcohol, and was smoking marijuana daily up until two to three weeks ago when he stopped.  *Id.* at 388, 413.  He identified his current medical problems as headache, rash, wrist pain, hypertension, neuropathy, photophobia, tinnitus, lumbago, astigmatism, refractive errors, neck pain, anxiety state, acute bronchitis, major depression, nicotine dependence, and chronic back pain.  *Id.* at 389.

Upon examination, Dr. Costa found that Plaintiff was oriented, his speech was normal, his affect was sad, he had passive suicidal ideations, and he was not eating.  Tr. at 390.  He diagnosed Plaintiff with major depressive disorder, anxiety disorder NOS, rule out PTSD from childhood trauma, nicotine dependence and cannabis abuse in early remission for three weeks.  *Id*. at 391.  Dr. Costa admitted Plaintiff to the Phoenix VA to ensure his safety based upon the suicidal ideations.  *Id*. He recommended individual, group and milieu therapy, as well as medication reconciliation.  *Id*.

Plaintiff was admitted to the Phoenix VA from March 29, 2012 through April 4, 2012 for diagnoses of major depressive disorder NOS, anxiety disorder NOS, probable PTSD (childhood trauma), nicotine dependence, and cannabis abuse in early remission.  Tr. at 321.  His GAF was rated at 30 upon admission, which indicated serious symptoms, and 60 upon discharge, indicative of moderate symptoms.  *Id.* at 321.  Plaintiff received therapy while in the hospital.  *Id*. at 423.

Dr. Costa conducted a mental status examination upon Plaintiff's discharge and found that Plaintiff had good eye contact and was cooperative, there were no psychomotor disturbances, he had normal speech rate and rhythm, coherent thought process, no auditory or visual hallucinations, average intellect, fair insight, judgment and impulse control, but thoughts of hopelessness and helplessness, and a sad worried affect with a mood that he described as one with high depression, but no nightmares."  Tr. at 325-326.  He was discharged in stable condition with the continuation of his medications and recommendations to continue therapy and to meet with a social worker for residential treatment.  *Id.* at 326.

On April 9, 2012, Plaintiff met with a social worker and the options for residential treatment were discussed.  Tr. at 328.  His social worker indicated that Plaintiff presented with a calm affect/mood, appeared rested, spoke in lower tones than usual, and he denied suicidal and homicidal ideations.  *Id*.  The social worker indicated that she would obtain information on a specific

residential treatment center that they had discussed and contact Plaintiff with that information. *Id.*

Also on April 9, 2012, Plaintiff met with PA Markson for follow up of his depression and anxiety. Tr. at 329. Plaintiff reported that he was still having nightmares despite medication prescribed for them and he was having trouble initializing sleep. *Id.* He stated that his energy was still low but his appetite was starting to improve. *Id.* He denied suicidal ideations and indicated that he was not really feeling suicidal at the time that he was admitted to the hospital, although he reported that he felt paranoid and anxious at times, especially around police or other security personnel since the March 3, 2012 incident in Utah. *Id.* Upon examination, Plaintiff was found to be alert and cooperative, with a somewhat anxious/depressed mood, but with forward-looking thoughts, such as getting into a residential treatment center and he had adequate judgment and fair insight. *Id.* Diagnoses were recurrent major depression and anxiety NOS with rule out of PTSD and generalized anxiety disorder. *Id.* Some of Plaintiff's medications were adjusted and activities were suggested for him to improve his socialization. *Id.*

Plaintiff underwent a consultative examination by Dr. Jones, M.D., for the Arizona Department of Economic Security Disability Determination Services Department on May 21, 2012. Tr. at 616. When Dr. Jones asked Plaintiff why he felt that he could not work, Plaintiff responded that his anxiety level was really high and he had chronic lower back pain. *Id.* Upon examination, Dr. Jones found that Plaintiff presented with a normal gait, had no assistive device, could rise and lower from the examination table and a chair without help and he was able to lie down on the table and recover without difficulty. *Id.* Dr. Jones noted that Plaintiff could tandem walk and walk on his heel and toes without difficulty, and he could squat and recover, hop on both feet and kneel and recover without difficulty. *Id.* Internal medicine examination showed no abnormalities and the musculoskeletal examination showed acceptable ranges of motion and other normal testing results in the cervical spine, thoracic and lumbar spine, the pelvis, the upper extremities and the lower extremities. *Id.* at 618-619. MRIs ordered by Dr. Jones showed moderate DDD of the cervical spine, normal lumbar spine, and mild diffuse DJD of the left shoulder. He diagnosed these conditions and noted Plaintiff's psychological issues. *Id.* He identified secondary diagnoses of hypertension, hypercholesterolemia, allergies, asthma and gastroesophageal reflux disorder. *Id.* at 619.

-8-

Based upon his findings, Dr. Jones opined that Plaintiff's conditions would impose limitations on him for twelve continuous months in that Plaintiff could lift up to twenty-five pounds frequently and fifty pounds occasionally, he had no standing, walking or sitting restrictions, and he had unlimited abilities as to seeing, hearing and speaking.  Tr. at 620-621.  He further opined that Plaintiff could frequently climb ramps and stairs, stoop, kneel, crouch and crawl, but he could never climb ladders, ropes or scaffolds and he had no limitations in reaching, handling, fingering or feeling.  *Id*. at 621.  Dr. Jones further concluded that Plaintiff had no environmental restrictions except that he could not be around excessive noises.  *Id*.

On May 22, 2012, Plaintiff had a CT of the abdomen and pelvis for his complaints of increasing pain starting in the left lower abdomen that spread across his lower abdomen, as well as constipation, and blood in his stool.  Tr. at 624.  The CT scan showed diverticulosis in the descending and sigmoid portions of the colon and extensive pericolonic inflammation and phlegmon formation in the region posterior to th sigmoid.  *Id.* at 624-625.

Plaintiff also had a follow-up with PA Markson concerning his depression and anxiety.  Tr. at 683.  He indicated that he felt better overall and he was more active and motivated.  *Id*.  He reported sleeping better, but he still felt anxious out in crowds.  *Id.*  He reported that he was smoking again and requested Bupropion to help him stop.  *Id*.  PA Markson indicated that Bupropion also helped mood as well, so it was prescribed.  *Id.*

On June 5, 2012, Plaintiff followed up at the VA for his diverticulosis and he indicated that he was doing well and his pain was much improved.  Tr. at 636.  On the same date, Plaintiff presented to the VA for his anxiety and depression.  *Id*. at 635.  He had called earlier that day and sounded upset, asking to be seen.  *Id*.  He reported that he was upset because his wife who was staying in Cleveland, Ohio with her grandparents wanted him to come to Cleveland to help and support her and his mother did not want him to go.  *Id*.  He also reported money issues, indicating that he had not yet heard whether he was going to get social security benefits and he did not complete school the past semester and was worried that he would have to repay his GI benefits.  *Id*.

Upon examination, Plaintiff was found to be alert, oriented, dysphoric and agitated, anxious, and depressed with an intense affect.  Tr. at 636.  He denied suicidal ideations and he was rambling,

but calmed down as the session progressed.  *Id.*  His judgment was fair and his insight was limited.  *Id.*  He was assessed with major depression, generalized anxiety disorder, with a rule out of PTSD.  *Id.*  Plaintiff was urged not to make rash decisions and to plan his approach.  *Id.*

On June 18, 2012, Plaintiff called PA Markson indicating that he was in Cleveland, Ohio and he had stress relating to this new situation.  Tr. at 635.  He reported that he had feelings of aggression when out in the community and he was having increased anxiety.  *Id.*  PA Markson titrated Plaintiff's Clonazepam and recommended that Plaintiff keep an eye on the Bupropion that had been added to his medication regimen.  *Id.*

On September 26, 2012, Plaintiff met with PA Markson and reported that he was back in the area from Cleveland with his wife as her grandmother had died and they decided to return.  Tr. at 697.  He noted that housing was in flux as his mother was moving to Texas and finances were tenuous.  *Id.*  He indicated that his wife was on a methadone maintenance program.  *Id.*  PA Markson indicated that Plaintiff was alert, appropriate, and had an "OK" mood, but was spontaneous, had some anxiety and some affective range.  *Id.*  Plaintiff's prescriptions were renewed.  *Id.*

On September 28,  2012, Plaintiff called the VA Homeless Prevention Hotline and reported that he was homeless.  Tr. at 695.  Plaintiff indicated that he was living in his truck and sometimes stayed with his mother when he was able to do so, but only to sleep there.  *Id.* at 696.  He was referred to the Phoenix VA.  *Id.*

On December 21, 2012, Plaintiff was taken by ambulance to the emergency room for an intentional drug overdose and suicide attempt.  Tr. at 721.  The hospital record indicated that Plaintiff had a court date earlier in the day that resulted in an unfavorable outcome so he went home and took several of his medications all at once.  *Id.*  The record further stated that Plaintiff became violent when the emergency medical services team arrived and he threw a firefighter through a window.  *Id.*  Plaintiff kept stating that he wanted to die.  *Id.*  He was admitted to the hospital.  *Id.*

At Banner Health Behavioral Hospital, Plaintiff indicated that when the firemen arrived, they were very rough and actually hit him with their fists.  Tr. at 733.  In describing the events leading up to transport to the emergency room, Plaintiff explained to the psychiatrist that he had a court date in which the outcome was favorable to him and when he got back home, he was having trouble

-10-

sleeping, so he took an extra Wellbutrin and Trazodone and his mother overreacted and felt that he was overdosing, so she called 911. *Id.* at 737. Plaintiff indicated that when the firemen and emergency medical service team arrived, he told them that he did not want to do go and an altercation ensued where he ended up with two black eyes and scratches from them forcing him out of the home and taking him to the emergency room. *Id.*

Upon examination, Dr. Gazda, the psychiatrist, found that Plaintiff had normal speech rate and rhythm, a euthymic mood and appropriate affect, coherent thought process and no delusions or hallucinations. Tr. at 738. He found Plaintiff's insight and judgment to be intact with no suicidal thoughts whatsoever. *Id.* Dr. Gazda diagnosed with recurrent major depression and stable chronic PTSD. *Id.* His GAF was 65, indicating mild symptoms. *Id.* at 739. Dr. Gazda indicated that Plaintiff did not need psychiatric hospitalization as he had no actual suicidal ideation and the emergency room report indicating that an unfavorable court outcome was incorrect as the outcome was favorable and Plaintiff merely had difficulty sleeping and took too much medication and his mother overreacted and called 911. *Id.* Dr. Gazda ordered Plaintiff released. *Id.*

## B. **TESTIMONIAL EVIDENCE**

At the ALJ hearing held on January 31, 2013, Plaintiff testified, as did a VE. Tr. at 31. Plaintiff testified that he was 38 years old and had an associate's degree from the community college while he was in the Air Force. *Id.* at 37. He reported that he was working as an assistant store manager for about a month but was fired based upon erroneous complaints about him. *Id.* at 38.

Plaintiff discussed his impairments, indicating that he had back pain which allowed him to sit and stand/walk for only an hour or two before he had to either get up or sit down. Tr. at 39. He could lift a gallon of milk and could lift twenty pounds on a good day. *Id.* He described his worst pain as in his lower back and left scapula. *Id.* at 41. He has pain in his left hand and tended to drop objects with that hand if he is not paying attention. *Id.* at 40. Plaintiff can squat down rather than bend over to pick up an object due to pain if he bends over to pick up an object. *Id.* Plaintiff further testified that he needed to lie down two to three times during the day while his pain medication starts to work for his headaches, back pain and arm pain. *Id.* at 41. He stated that he gets migraines and has gotten them since he was a child which makes him light sensitive so he has to take Tylenol and

lie down and fall asleep. *Id*. at 42, 54.  He has migraines about five to six times per month. *Id*. at 43.  Plaintiff also indicated that using the CPAP machine for his sleep apnea makes him sleep more and he has to use the bathroom a lot and has stomach pain due to diverticulitis which causes stomach cramps all day and he has to be in the bathroom twenty to thirty minutes each time. *Id*. at 44.  He indicated that he has problems breathing and gets congested a lot so he uses inhalers, although he stated that he was still smoking cigarettes. *Id*. at 49.  He also acknowledged positive urine drug screens for marijuana and explained that he had a medical marijuana card for the last year. *Id*. at 50.  He explained that he uses marijuana every day or every other day at a minimal quantity. *Id*. at 56.  Plaintiff also discussed his panic attacks, indicating that he had them "all the time," especially when he was driving or out in public. Tr. at 45.  He also testified as to a constant fear of the police, fire department and paramedics. *Id*. at 46.  He related memory problems, explaining that he has a very short memory lately and he used to have a great memory for facts. *Id*. at 46-47.  Plaintiff reported that he does not get along well with others and if he worked at a job and his boss told him that he was not doing a task correctly and needed to do it in a different way, he would quit the job on the spot. *Id*. at 47.  He also indicated that he showers and changes his clothes only about once a week. *Id*. at 49.

Plaintiff testified that he does not do much of the cleaning around the house, although he tries to clean his own bedroom, but his mother and wife do most of the housework, cooking and cleaning. Tr. at 50.  Plaintiff explained that his mother is disabled and his wife does not work outside of the home. *Id*. at 53.  He estimates that he has about 15 or more "bad" days per month which stem from his physical and mental health. *Id*. at 52.  Plaintiff indicated that he was attending Ottawa University in 2011 or 2012, but he had to drop out because of all of the stressors in his life at that time and he had enrolled in order to get the GI bill money. *Id*. at 53.  He stated that he actually went to school for about three weeks. *Id*.

The ALJ then questioned the VE, presenting a hypothetical individual to him, including one who had the background of Plaintiff, with limitations to: understanding, remembering and carrying out simple tasks; making simple, work-related decisions; working best with objects or data; working independently as opposed to with a team; and having only occasional superficial interaction with

co-workers, supervisors; and no work with the public.  Tr. at 64.  When the ALJ asked if such a hypothetical person could perform jobs existing in significant numbers in the national economy, the VE responded that such a person could perform the representative occupations of kitchen helper, hand packager and cook helper.  *Id*. at 64-65.

The ALJ modified the hypothetical individual to include an exertional limitation to light work, and the VE responded that such an individual could perform the representative occupations of a housekeeping cleaner, hotel/motel cleaner, power screwdriver operator, and car wash attendant. *Id*. at 65-66.  The ALJ then added a limitation of only occasional overhead reaching with the non-dominant, upper extremity, to which the VE responded that such an individual could still perform the jobs that he had identified, although the number of jobs available would be somewhat eroded by 10 percent.  *Id*. at 66.  The ALJ also added a limitation of unscheduled bathroom breaks five to six times per day lasting twenty to thirty minutes, and the VE responded that such an individual would not be able to hold any full-time job.  *Id*. at 67.

Upon questioning by Plaintiff's attorney, the VE admitted that frequent unscheduled bathroom breaks for bowel issues would create problems for the kitchen helper position.  Tr. at 68. The VE also indicated that an employee could not miss more than one or more days per month and trouble responding to a supervisor that created major conflict on a regular basis would lead to the hypothetical individual being fired.  *Id*. at 70.

## IV.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.  An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

-13-

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).   Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.    ANALYSIS

### A.    NEW AND MATERIAL EVIDENCE

Plaintiff asserts that after the ALJ denied his claim in the instant case, he appealed this decision to the Appeals Council and submitted updated disability ratings that he received from the

-14-

Department of Veterans Affairs ("DVA") which showed that effective February 29, 2012, Plaintiff was 100% disabled due to GAD and panic disorder, 10% disabled for allergic rhinitis, and 20% disabled due to chronic lumbar spine strain.  ECF Dkt. #13 at 11-14; Tr. at 744-749.  Plaintiff complains that the Appeals Council acknowledged this evidence, but denied his request for review of the ALJ's decision which was reversible error under sentence six of 42 U.S.C. 405(g) as this evidence was new and material.  ECF Dkt. #13 at 11.  Plaintiff asserts that the Appeals Council failed to explain why this evidence did not warrant a remand.  *Id.*

The undersigned first notes that the Appeals Council's denial of Plaintiff's request for review is not subject to appeal in this Court.  "The Appeals Council may deny a party's request for review or it may decide to review a case and make a decision, but "[t]he dismissal of a request for Appeals Council review is binding and not subject to further review."  20 C.F.R. §§ 404.981, 404.972.  While new material evidence may be submitted for consideration to the Appeals Council pursuant to 20 C.F.R. § 404.970, a federal court's review is generally limited to the ALJ's decision, not the denial of review by the Appeals Council.  *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1233  (6th Cir. 1993) citing *Phelps v. Sec'y of Health and Human Servs.*, 961 F.2d 1578 (6th Cir.1992).  Moreover, the Appeals Council is not required to make specific findings in its decision when it denies a request for review.  *Parks ex rel D.P. v. Comm'r Soc. Sec. Admin.*, 783 F.3d 847, 852 (11th Cir. 2015), citing 20 C.F.R. §§ 416.1467, 416.1470(b) and *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780 (11th Cir. 2014).  20 C.F.R. § 416.1470(b) merely requires the Appeals Council to "consider the additional evidence" that is new, material and chronologically relevant.  *Id*.

The Appeals Council in the instant case indicated that it had considered the additional evidence that was listed on its Order, which specified the DVA decision that modified Plaintiff's DVA claim effective February 29, 2012.  Tr. at 2, 5.  Based upon the social security regulations and the caselaw cited above, the undersigned recommends that the Court find that the Appeals Council was not required to explain its decision and it is the ALJ's decision and not the Appeals Council's decision that is subject to review by this Court.

-15-

However, as to the most recent DVA assessment, sentence six of § 405(g) addresses situations where a claimant submits new evidence that was not presented to the ALJ but that could alter the ALJ's ultimate decision. Sentence six of § 405(g) provides, in relevant part:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both....

42 U.S.C. § 405(g).

A "sentence six" remand is appropriate "only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  Evidence is "new" if it did not exist at the time of the administrative proceeding and "material" if there is a reasonable probability that a different result would have been reached if introduced during the original proceeding. *Id*. "Good cause" is demonstrated by "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). "The party seeking a remand bears the burden of showing that these requirements are met." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006).  Courts "are not free to dispense with these statutory requirements." *Id*. at 486.

In a sentence-six remand, the court does not rule in any way on the correctness of the administrative decision, neither affirming, modifying, nor reversing the Commissioner's decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*

In order to show good cause,  a claimant is required to detail the obstacles that prevented him or her from entering the evidence in a timely manner.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 Fed.

Appx. 713, 725 (6th Cir. 2012). The Sixth Circuit "takes a harder line on the good cause test with respect to timing and thus requires that the claimant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id*., quoting *Oliver v. Sec'y of Health & Human Servs*., 804 F.2d 964, 966 (6th Cir. 1986).

The social security regulations define "evidence" as including "[d]ecisions by any governmental or nongovernmental agency about whether or not you are disabled..." 20 C.F.R. §§ 404.1512(b)(v), 416.912(b)(v). Thus, the most recent DVA assessment in this case is relevant evidence. However, the regulations further provide that such decisions are not binding upon the SSA because "[a] decision by ... any other governmental agency about whether you are disabled is based on its rule and not our decision about whether you are disabled or blind." 20 C.F.R. §§ 404.1504, 416.904.

Moreover, the most recent DVA decision itself is insufficient to constitute new and material evidence. In *Deloge v. Commissioner of Social Security*, the Sixth Circuit Court of Appeals found that a social security claimant was not entitled to the remand of his claim due to a subsequent VA determination that he was 100% disabled. 540 Fed. App'x 517 (6th Cir. Oct. 15, 2013). The Sixth Circuit held that "[t]he fact of a subsequent favorable assessment is not itself new and material evidence under § 405(g); only the medical evidence that supported the favorable assessment can establish a claimant's right to remand." *Id*. The Court held that Deloge's brief did not discuss or cite to the specific evidence upon which the DVA had relied when it issued its newest determination and thus he had not met his burden of establishing that the evidence was new and material. *Id.* at 519. However, the Court addressed Deloge's claim because the basis of the DVA's recent assessment in his case was in the administrative record as the DVA included a letter outlining the evidence that it relied upon in making its latest determination. *Id*. The Court ultimately found that Deloge failed to show a reasonable probability of the Commissioner reaching a different conclusion in its 2005 decision because the most recent DVA assessment in 2008 relied upon evidence showing a deterioration of the Deloge's health after the ALJ denied his claim, and courts have declined to remand claims in light of medical evidence of deteriorated conditions. *Id*. The Court noted that the appropriate remedy is not to remand the case but for the claimant to make "a new claim for benefits

as of the date that the condition aggravated to the point of constituting a disabling impairment." *Id.* at 519-520, quoting *Sizemore*, 865 F.2d at 712.

Similar to *Deloge*, Plaintiff in this case fails to discuss or cite to the specific evidence upon which the DVA relied when it issued its newest determination and thus he has not met his burden of establishing that the evidence was new and material. *Deloge*, 540 Fed. App'x at 519. However, unlike *Deloge*, the administrative record in the instant case does not contain a letter outlining the evidence that the DVA relied upon in making its most recent determination. Without evidence cited by Plaintiff and no identification of the evidence that the DVA relied upon in making its recent determination, the undersigned recommends that this Court find that Plaintiff has failed to meet his burden of establishing that the evidence that the DVA used in its recent determination was new and material.

In *Deloge*, the Court ultimately found that Deloge failed to show a reasonable probability of the Commissioner reaching a different conclusion in its 2005 decision because the most recent DVA assessment in 2008 relied upon evidence showing a deterioration of the Deloge's health after the ALJ denied his claim, and courts have declined to remand claims in light of medical evidence of deteriorated conditions. 540 Fed. App'x at 520. Even reviewing the medical evidence in the administrative record in this case in order to attempt to determine the evidence relied upon by the DVA, all of the evidence contained therein was before the ALJ and she rendered her decision based upon that evidence. Without identification of medical evidence or submission of the actual medical evidence relied upon by the DVA in its latest determination in order to determine if it was different than that relied upon by the ALJ here, the undersigned recommends that the Court deny Plaintiff's request for a remand on the basis of new and material evidence.

**B.      CREDIBILITY**

Plaintiff also contends that substantial evidence does not support the ALJ's credibility assessment because she erred in considering the required factors when assessing his credibility. ECF Dkt. #13 at 14-16. For the following reasons, the undersigned recommends that the Court find that the ALJ applied the correct legal standards and substantial evidence supports the ALJ's credibility determination.

-18-

The social security regulations establish a two-step process for evaluating pain.  *See* 20 C.F.R. § 404.1529 , SSR 96-7p.  In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain.  *See id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms.  *See id.*  Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities.  *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p.  *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990).  These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40.  Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination.  *See Casey*, 987 F.2d at 1234.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Plaintiff first complains about a statement that the ALJ presented in her credibility analysis

-19-

in which she indicated that ""there must first be objective medical evidence confirming the existence of a medically determinable impairment and resulting limitations."  ECF Dkt. #13 at 14, citing Tr. at 20-21.  He asserts that this statement was vague and unsupported because there are 434 pages of medical records in this case and despite this statement, the ALJ nevertheless found sufficient evidence established that he had the severe impairments of DDD of the cervical spine, obstructive sleep apnea, headaches/migraines, diverticulitis, hypertension, left shoulder DJD, anxiety disorder NOS vs. PTSD, major depressive disorder and cannabis abuse.  ECF Dkt. #13 at 14-15, citing Tr. at 18.

The undersigned recommends that the Court find that Plaintiff takes this portion of one of the ALJ's statements out of context.  The rest of the paragraph surrounding this statement, which is only part of a sentence, is useful in developing the context.  The ALJ began by stating that Plaintiff in this case has not had the type of medical treatment expected for a totally disabled person and the medical evidence was minimal.  Tr. at 20.  She then indicated that "[e]ven were the claimant's allegations concerning his pain and related symptoms to be credible, in order to find the existence of a disabling impairment, there must first be objective medical evidence confirming the existence of a medically determinable impairment and resulting limitations."  *Id.* at 20-21.  She continued that objective evidence must establish limitations, not just the statements by the claimant. *Id.* at 21.  She further stated that "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms (SSR 96-7p)."  This is the exact language of SSR 96-7p, the social security ruling providing guidance on assessing credibility.  SSR 96-7p.

The ALJ proceeded onward, indicating that "[t]he objective findings, diagnostic studies, treatment modalities, and treatment record on the whole illustrate the claimant's limitations are not debilitating."  Tr. at 21.  She discussed each of Plaintiff's impairments and the medical evidence concerning each impairment in the subsequent paragraphs.  She discussed his treatment concerning each impairment, the observations of the treating doctors when he presented to them, his use of no

-20-

assistive devices, the x-rays and other test results, Plaintiff's sporadic mental health care treatment, his testimony at the hearing, his daily activities, Dr. Monte's consultative opinion and the opinions of the agency reviewing physicians, the VA's 2008 assessment, and Plaintiff's work history.  *Id*. at 21-24.  These are all proper considerations in determining Plaintiff's credibility.  SSR 96-7p ("[i]n determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.").

Plaintiff also asserts that the ALJ cited to medical records indicating his normal gait and use of no assistive devices and the fact that he had only intermittent treatment for his physical impairments.  ECF Dkt. #13 at 15.  The undersigned recommends that the Court find that these are proper considerations as the normal gait and lack of assistive device constitutes information provided by treating or examining physicians under SSR 96-7p and are clinical signs provided by treatment providers under 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2).  Further, an ALJ can consider Plaintiff's treatment options in evaluating credibility and complaints of disabling pain.  20 C.F.R. §§ 404.1529(c)(3)(iv-v) and 416.929(c)(3)(iv-v).

Additionally, these are not the only facts that the ALJ relied upon in making her credibility assessment.  The ALJ also cited to relatively unremarkable physical examinations showing normal ranges of motion and few complaints by Plaintiff of musculoskeletal problems to his physicians, as well as May 2012 x-rays showing only moderate diffuse degenerative changes of the cervical spine, normal lumbar spine and mild diffuse degenerative changes in the left shoulder.  Tr. at 22-23.  She also noted that Plaintiff did not have any MRIs, epidural injections, chiropractic treatment or physical therapy.  *Id*. at 21.  She further noted that no treating physician placed any physical limitations upon Plaintiff and although Dr. Jones found that he could perform medium work, she attributed this opinion little weight because it did not reflect that Dr. Jones had considered all of Plaintiff's impairments in combination.  *Id*. at 23.  These are all proper factors to consider in assessing credibility and the undersigned recommends that the Court find that the ALJ did not error

in making such findings.  20 C.F.R. §§ 404.1529, 416.929.

Plaintiff also finds fault with the ALJ's statement concerning his testimony that it hurt to raise his arms and he occasionally dropped objects.  ECF Dkt. #13 at 15.  The ALJ noted Plaintiff's testimony regarding pain in raising his arms and dropping objects on occasion, but she noted that no evidence existed that he offered such complaints to treatment providers.  Tr. at 22.  Plaintiff cites to repeated diagnoses of neck pain and shoulder joint pain, as well as a medical history of rotoscoliosis in his shoulder with degenerative spurring and an incomplete posterior fusion of the S1.  ECF Dkt. #13 at 15, citing Tr. at 481, 484, 499, 501, 551, 552, 574, 616.  However, none of the medical records cited by Plaintiff confirm that he complained about an inability to raise his arms or about dropping objects from his hands.  Tr. at 481, 484, 499, 501, 551, 552, 574, 616.  Further, the ALJ cited to physical examinations indicating no evidence of loss of grip strength or limits on handling or fingering.  *Id*. at 22.  Dr. Jones had found no limitations in Plaintiff's abilities to reach, handle, finger or feel objects.  *Id*. at 621.  Despite the lack of such evidence, the ALJ nevertheless limited Plaintiff's RFC to only occasionally reaching overhead with the non-dominant left upper extremity.  *Id*. at 20.  The undersigned recommends that the Court find no error by the ALJ as to this finding as substantial evidence supports the determination and the ALJ credited part of Plaintiff's testimony by limiting his ability to reach overhead.

Plaintiff also asserts that the ALJ's assessment of his daily living activities is misleading and omits favorable facts as while the ALJ indicated that Plaintiff could care for his own hygiene and grooming, Plaintiff testified that he needed reminders to care for his hygiene and he only changes his clothes once every three days and felt no reason to bathe, showering only once per week.  ECF Dkt. #13 at 15-16, citing Tr. at 23, 49, 284.  Plaintiff also points out that the ALJ found that Plaintiff was taking classes at Ottawa University, but neglected to mention that he dropped out because he was not able to complete his classes.  ECF Dkt. #13 at 16, citing Tr. at 23.  The undersigned points out that Plaintiff did not state that he was unable to care for his hygiene, and the ALJ acknowledged as much when she indicated that he could care for his hygiene "with some decreased motivation."  *Id*. at 23.  The ALJ also cited to Plaintiff's function report in which he indicated that he made food, went to the store for groceries, performed some household chores, cared for a cat, went outside, used

public transportation, and prepared simple meals.  *Id*., citing Tr. at 283-284.  An ALJ may consider household and social activities engaged in by the claimant in evaluating his assertions of pain or ailments. *See Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir.1990); *Crisp v. Sec'y of Health and Human Servs*., 790 F.2d 450, 453 (6th Cir.1986).  While the ALJ did overstate Plaintiff's educational endeavor at Ottawa University, this one statement does not negate or render the rest of the factors properly considered harmfully erroneous.

Accordingly, while the ALJ did make an overstatement as to one credibility finding, the undersigned recommends that the Court find that the ALJ applied the appropriate credibility standard, adequately articulated her credibility determination, and substantial evidence supports her decision to discount Plaintiff's credibility based upon the reasons that she stated.  The ALJ cited to objective medical evidence, Plaintiff's medications and treatment modalities, and Plaintiff's testimony and daily activities in support of her decision to partially discount Plaintiff's credibility.

### C.      STEP FIVE DETERMINATION

Plaintiff also asserts that the ALJ Step Five analysis is erroneous because it was based upon errors in determining Plaintiff's credibility and the new and material evidence presented by Plaintiff supports Plaintiff's statements concerning his inability to work.  ECF Dkt. #13 at 16-17. Plaintiff contends that due to these errors, the VE's opinion was based upon an incomplete hypothetical presented to him by the ALJ.  *Id.*

The undersigned has already recommended that the Court find that the ALJ correctly applied a credibility assessment and substantial evidence supports the ALJ's credibility analysis.  Thus, the ALJ's hypothetical individual that he presented to the VE and ultimately used in her decision was proper.  An ALJ is under no duty to incorporate a claimant's unsubstantiated complaints into the hypothetical individuals that she poses to the VE. *Griffith v. Comm'r f Soc. Sec*., 217 F. App'x 425, 429 (6th Cir.2007) ("The rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to assess credibility and determine the facts. In fashioning a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible.") (internal citations omitted).  A VE's testimony will provide substantial evidence to support an ALJ's decision only

when the testimony is elicited in response to a hypothetical question which accurately portrays the claimant's physical and mental limitations. *Parley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir.1987). Here, the undersigned recommends that the Court find that the ALJ's hypothetical individual as presented to the VE accurately portrayed Plaintiff's physical and mental limitations. Tr. at 63-66. As such, the undersigned recommends that the Court find that the VE's testimony provided substantial evidence to support the ALJ's conclusion that Plaintiff was able to perform jobs existing in significant numbers in the national economy and was therefore not disabled.

## VII. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety with prejudice.


DATE: May 29, 2015                                    */s/George J. Limbert*
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE


Any OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

-24-